FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 2 8 2007

JAMES N. HATTEN, CLERK
By: [signature]
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THE POWELL COMPANY,

       Plaintiff,

v.

THE McGAREY GROUP, LLC, DENVER
McGAREY and CHRIS McGAREY,

       Defendants.

CIVIL ACTION NO.

1:05-CV-2614-JEC

## O R D E R  &  O P I N I O N

This case is presently before the Court on defendants' Motion for Summary Judgment [49]; defendants' Motions to File an Amended Answer to the Second Amended Complaint [45, 46]; and plaintiff's Motion to File and Substitute Original Depositions in Place of Filed Certified Copies [59]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendants' Motion for Summary Judgment [49] should be **GRANTED in part and DENIED in part,** defendants' Motions to File an Amended Answer to the Second Amended Complaint [45, 46] should be **GRANTED,** and plaintiff's Motion to File and Substitute Original Depositions in Place of Filed Certified Copies [59] should be **DENIED** and, in the alternative, as requested by plaintiff, the Court will

AO 72A
(Rev.8/82)

accept the certified copies previously filed.

**BACKGROUND**

## I.   **Procedural History**

Plaintiff, the Powell Company, Inc. ("plaintiff" or "Powell"), filed its initial complaint on September 13, 2005 in the Superior Court of Fulton County, alleging breach of contract, unjust enrichment, quantum meruit and attorney's fees against the McGarey Group ("defendant" or "McGarey") to seek recovery allegedly due under a valid contract. ("Compl." [1].) On October 11, 2005, McGarey removed the case to this Court ("Mot. to Remove" [1]), and filed a Motion to Dismiss on October 18, 2005. ("Mot. to Dismiss" [2].)

Plaintiff then filed a Motion for Leave to File a First Amended Complaint on November 4, 2005 ("Mot. to File First Am. Compl." [4]), along with its Opposition to Defendant's Motion to Dismiss. ("Opp'n to Mot. to Dismiss [3].) On November 29, 2005, this Court granted plaintiff's Motion to File an Amended Complaint and denied defendant's Motion to Dismiss. ("November 29, 2005 Order" [11].) Thereafter, McGarey moved to transfer the action to California on November 14, 2005 ("Mot. to Transfer" [6]) and filed a Motion to Dismiss Plaintiff's First Amended Complaint on December 16, 2005. ("Mot. to Dismiss First Am. Compl." [14].) This Court denied both motions on January 24, 2006 ("January 24, 2006 Order" [21].)

During discovery, plaintiff filed an unopposed Motion to File a

2

Second Amended Complaint, adding Denver McGarey and Chris McGarey, the owners of McGarey, to the Complaint as individual defendants. ("Mot. to File Sec. Am. Compl." [30].) The Court granted plaintiff's Motion to File a Second Amended Complaint on March 27, 2006 ("March 27, 2006 Order" [37].) On July 5, 2006, as discovery proceeded, defendants filed a Motion to Amend Answer to assert the affirmative defense of accord and satisfaction ("Mot. to Amend Ans." [45].) The defendants filed what appears to be the same Motion to Amend Answer the following day, July 6, 2006 ("Mot. to Amend Ans." [46]). This motion is now pending before the Court. Defendants later filed a motion for summary judgment on August 1, 2006. ("Mot. for Summ. J." [49]), which is also pending before this Court.

## II.  **Factual Background**

Plaintiff Powell, filed an action against McGarey and its two officers and shareholders, Denver McGarey ("Mr. McGarey") and Chris McGarey ("Ms. McGarey"), seeking damages allegedly due under a valid contract, to recover costs of litigation, to seek an accounting of all monies due under the contract, to recover damages for fraud, deceit, and misrepresentation/concealment of fact, to pierce the corporate veil of McGarey, and to recover punitive damages. ("Sec. Am. Compl." at 1-3; Defendants' Statement of Undisputed Facts "DSMF" [49] at ¶ 2.)

McGarey operates as a California company, engaged in the

3

business of leasing space at retail projects. (DSMF at ¶ 1.) Ms. McGarey and her husband, Mr. McGarey, serve, respectively, as the Chief Officer and President of McGarey. (DSMF at ¶ 2.) In 2001, McGarey began working as a leasing agent for what is now known as the Atlantic Station project in Atlanta (the "Project"). (DSMF at ¶ 4.) McGarey entered into a leasing agreement (the "Leasing Agreement") with the owners of the Project ("Owners") that commenced on March 1, 2001, and was set to expire in two years. (DSMF at ¶ 6; "Leasing Agreement" attach. as Ex. A to Mot. for Summ. J.)

According to the terms of the Leasing Agreement, McGarey was to receive base pay of $20,000 for the first month, and $35,000 per month for each additional month. (DSMF at ¶ 7; Leasing Agreement at 3.) McGarey's compensation under the Leasing Agreement also included Additional Compensation of $3.00 per square foot leased. (PSMF at ¶ 4; Leasing Agreement at 4). The Leasing Agreement also contained a provision requiring 60% of the base fee to be applied as a credit against the square footage commission due McGarey. (DSMF at ¶ 8; Leasing Agreement at 3.)

McGarey called upon Robert K. Powell ("Mr. Powell"), the sole officer, shareholder, and employee of Powell, to help McGarey meet the leasing objectives of the Project. (PSMF at ¶ 7; DSMF at ¶¶ 9, 11.) On March 16, 2001, McGarey and Powell entered into a one-year contract, renewable for an additional 12 months, which defined the

4

parties' working relationship with respect to the Project. ("Contract" attach. as Ex. C to Mot. for Summ. J.) According to the Contract, Powell would assist McGarey in the leasing and marketing of the Project and would also act as Vice-President of McGarey. (DSMF at ¶ 13; Contract at 1.) Part of Powell's responsibilities included generating leasing reports for the Project. (DSMF at ¶ 14; Contract at 1.)

Plaintiff's compensation under the Contract included "Base Compensation," ("Base Compensation") defined as "Five Thousand Dollars ($5,000.00) per month, payable on the first day of each month or upon receipt of the monthly retainer due TMG, whichever shall last occur." (Contract at 1.; DSMF at ¶ 16.) The Contract also provided for "Additional Compensation" ("Additional Compensation") according to the following schedule:

```
At 25% lease-up - $25,000
At 50% lease-up - $25,000
At 75% lease-up - $50,000
At 95% lease-up - $50,000
```

(Contract at 2.)

The term "lease-up" in the Contract refers to leases fully executed by the Project Owner and the tenants. (DSMF at ¶ 18.) The Contract also required that Powell receive "lease-up" credit for any unmet threshold completed within sixty days of the termination of the Contract. (DSMF at ¶ 51; Contract at 2.)

5

Both the Leasing Agreement and the Contract between plaintiff and defendants expired according to their terms in March 2003. (DSMF at ¶ 20). However, all parties continued to work on the Project past March 2003. (*Id.*) Nevertheless, in 2004, payments by the Owners began to fall into arrears. (DSMF at ¶ 21.) Defendants' payments to plaintiff thereupon began to dwindle, as well. (PSMF at ¶ 21.) Plaintiff agreed to wait until the close of the construction loan to receive payment, at which time defendants were set to receive the balance of their compensation from defendants. (PSMF at ¶ 21.) Defendants and Owners closed on the construction loan in late 2004 or early 2005. (PSMF at ¶ 24; DSMF at ¶ 25.) By this time, the Owners owed defendants $890,000 in back payments. (DSMF at ¶ 28.)

In response to the late payments, on January 20, 2005, the Owners' representative, John Whitaker, sent a letter to McGarey with a check in the amount of $483,933 as final payment of all sums. (DSMF at ¶ 29; "January 20, 2005 Letter" attach. as Ex. B to Mot. for Summ. J.) According to this letter, McGarey received a monthly retainer through October 2004. (January 20, 2005 Letter.) However, the Owners applied an increased credit-back (from 60% to 80%) to some of defendants' monthly payments. (*Id.* at 2.) The Letter also indicated that the settlement figured represented McGarey's payment for Additional Compensation. (*Id.* at 1.)

On February 10, 2005, McGarey tendered to Powell two checks--one

6

AO 72A
(Rev.8/82)

for $6108.21 for the balance due on the monthly retainer and one for $50,000 for the Additional Compensation—along with a letter explaining the calculation of final payments. (DSMF at ¶ 35; "February 10, 2005 Letter" attach. as Ex. D to Mot. for Summ. J.) Powell cashed both of these checks without any indication that the payments were incorrect, partial, or inadequate under the Contract. (DSMF at ¶ 49.)

McGarey based its payment of Base Compensation to Powell upon the final compensation it had received from the Owners. Specifically, McGarey only paid Powell a monthly retainer through the beginning of July due to the Owners' increase in the credit-back provision. (*Id.* at ¶¶ 30, 32.) McGarey explained in its February 10, 2005 Letter that the increased credit-back provision "results in an effective compensation ending with a partial (20%) payment of July 2004; thus [plaintiff's] compensation reflects the same." (February 10, 2005 Letter).

McGarey also paid Powell $50,000 in Additional Compensation based on the percentage of square feet leased up as of December 2004. The December 2004 Leasing Status Report indicated that 63.49% of the Project's Retail space had been leased and that 8.68% of square footage was out for execution. (DSMF at ¶¶ 34, 37; "December 2004 Leasing Status Report" attach. as Ex. G to Mot. for Summ. J.) McGarey reasoned that, because more than 50% of the space had been

7

leased out, plaintiff was entitled to $50,000 in Additional Compensation. (*Supra* at 5.)

Powell, however, alleges that the "lease-up" percentages in the written agreement refer to percentages of a fixed square footage of 500,000 square feet. (Powell Dep. [61] at 9:21-10:13; 12:8-12; 186:12-22.) Powell contends that he leased over 500,000 square feet, and, therefore, that he met the 95% lease-up threshold. (Opp'n to Mot. for Summ. J. at 14.)

Powell treated the February 10, 2005 Letter as a termination of the Contract and did not invoice McGarey for any balance due under the Contract after this date. (DSMF at ¶ 50.) However, well before the termination of the Contract, Powell had been seeking additional work outside of the Contract. (DSMF at ¶ 71.) In August 2004, Powell worked with Anthony Filingeri ("Filingeri"), an owner of Sprint stores, to assist in the location of possible store locations. (DSMF at ¶ 72.) Powell also indicated in September 2004 that he would not exert the same level of effort on the Project. (DSMF at ¶ 73; "September 16, 2004 Email" attach. as Ex. H to Mot. for Summ. J.)

Powell now seeks additional Base Compensation based on his interpretation of the Contract, as well as Additional Compensation of $100,000 in recognition of his leasing over 95% of the Project's 500,000 square feet. Defendants filed a Motion for Summary Judgment regarding these claims, which is now pending before this Court.

8

Defendants also seek to amend their answer to plaintiff's second amended complaint to add a defense of accord and satisfaction.

## DISCUSSION

### I.   **Summary Judgment Standard**

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322-23.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir. 1990). The movant is not required to negate his opponent's claim, however. The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. After the movant has carried his burden, the nonmoving party is then required to "go

9

beyond the pleadings" and present competent evidence[1] designating "'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting FED. R. CIV. P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249-50. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is

---

[1]   The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex*, 477 U.S. at 324.

created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249-50. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

## II.  **Defendants' Motion for Summary Judgment**

### A.  **Plaintiff's Claim for Base Compensation Under the Contract**

Plaintiff executed a contract with defendant whereby plaintiff would receive Base Compensation in the amount of "Five Thousand Dollars ($5,000.00) per month, payable on the first day of each month or upon receipt of the monthly retainer due T.G., whichever shall last occur." (Contract at 1.; DSMF at ¶ 16.)  In essence, defendants argue that this provision only requires McGarey to pay plaintiff a monthly retainer for the months that it received a monthly retainer from the Owners.  For some time, defendants paid plaintiff once the defendants had received payments from the Owners, and this system worked without complaint by either party.  Moreover, by March 2003 even though both McGarey's agreement with the Owners and Powell's agreement with McGarey had reached their respective two-year limits, all parties continued to work on the Project, according to the Contract terms.  (Mr. McGarey Dep. at 47:21-48:23; 128:10-132:11.)

Unfortunately for all parties, by 2004, the base fee payment from the Owners had begun to fall into arrears.  (DSMF at ¶ 21.)  In

11

turn, defendants' payments to plaintiff began to dwindle.  (PSMF at ¶ 21.)  In recognition of the late payments, defendants represented that plaintiff would receive payment for additional commissions once the Owners closed on their construction loan.  ("November 5, 2004 Letter re: TCAS Payments" attach. as Ex. 22 to Powell Dep. "We have not been paid any pf (sic) the past-due retainer; however, we have been told (recently) by the new CEO that we will be paid the commissions due (based upon executed Lease occupancy) at the closing of their construction loan with BOA.")   Plaintiff agreed to wait until the construction loan for payment. (PSMF at ¶ 21; Powell Dep. [61] at 94:18-96:17.)[2]

In late December 2004 or early January 2005, the Owners closed on the construction loan, which triggered defendants' obligation to pay plaintiff.  (DSMF at ¶ 27; Mr. McGarey Dep. at 106:25-107:4.)  By that time, the Owners owed defendants $890,000, with an additional amount due when tenants actually took up occupancy in the Project

---

[2] At that time of this agreement, it is unclear whether, and to what extent, defendants had been paid their monthly retainer by the Owners.   According to plaintiff, as of December 2004, the Owners were 90 days in arrears on the base compensation owed defendants. (PSMF at ¶ 22; Ms. McGarey Dep. at 26:14-27:5.)   Plaintiff also contends that defendants were approximately six months in arrears on their payments to plaintiff.  (PSMF at ¶ 23; Powell Dep. at 98:4-9; "December 31, 2004 Fax re: Open Invoices" attach. as Ex. M to Mot. for Summ. J.; "December 25, 2004 Statement" attach. as Ex. N to Mot. for Summ. J.")

12

AO 72A
(Rev.8/82)

after its construction.   (DSMF at ¶ 28; Ms. McGarey Dep. at 25:19-25.)

On January 20, 2005, the Owners' representative, John Whitaker, sent a letter to the McGarey Group with a check in the total amount of $483,933 as a final payment for all sums.   (DSMF at ¶ 29; Mr. McGarey Dep. at 52:4-14; 54:6-55:3; Ms. McGarey Dep. at 41:6-9.)   The letter indicated that the payment included retainer payments through October 31, 2004.   Specifically, the letter stated:

> Attached is a commission check in the amount of $483,933.00 representing our negotiated settlement of compensation to The McGarey Group for leasing activities on the Atlantic Station project through the closing of the construction loan . . . This schedule outlines the application of commissions on executed deals against the retainer paid through October 31, 2004 and identifies anticipated deals in process against which we will apply future commissions to retire the remaining balance of the retainer.

("January 20, 2005 Letter" attach. as Ex. 2 to Mr. McGarey Dep.)

Despite the January 20, 2005 letter purporting to pay defendants a monthly retainer through October 2004, defendants contend that because of an increase in  the credit-back provision--from 60% to 80%--that was applied to defendants' monthly payment, they only received a monthly retainer fee through the beginning of July, 2004.   (January 20, 2005 Letter at 1; Mr. McGarey Dep. at 53:1-12; 57:3-58-17; Ms. McGarey 41:12-20.)   As Ms. McGarey explained, "So I took the difference between what we were owed under the contract, which was a

13

60 percent credit back and the 80 percent credit back, and backed that into a monthly and then daily amount to come up to a point where we were paid in accordance with our agreement." (Ms. McGarey Dep. at 48:25-49:5.) Based on defendants' calculation of the money received from the Owners, defendants paid plaintiff a retainer fee through one-fifth of July 2004. According to defendants' interpretation of the Contract, plaintiff was only entitled to payment through July because defendants only received payment through July.

Plaintiff, however, argues that because defendants received a monthly payment, though not the monthly payment contemplated under the Leasing Agreement through October 2004, he should receive payment through October 2004. In other words, plaintiff contends that he should not be penalized for defendants' decision to allow the Owners to increase the credit-back to eighty percent.

Interestingly, while the parties spent a considerable amount of time debating whether plaintiff should receive payment through July or October based on the Owners' payment of base pay to defendants, plaintiff and defendants fail to address the initial question, which this Court must resolve: to wit, whether the base fee provision in the Contract amounts to a condition precedent or merely a timing device.

Georgia courts distinguish between conditions regarding the creation of an obligation and a condition only as to the time of

14

performance.  *See L. Gregg Ivey, Inc. v. Land*, 148 Ga. App. 667, 668
(1979) (citing *MacLeod v. Belvedale, Inc.*, 115 Ga. App. 444, 446
(1967) "'When the existence of a debt is conditional on the happening
of some event, payment cannot be enforced until the event happens;
but when payment of an existing liability is postponed until the
happening of an event which does not happen, payment must be made
within a reasonable time.'") (internal quotation omitted).

Here, the Contract states that plaintiff shall receive "Five
thousand dollars ($5,000.00) per month, payable on the first day of
each month or upon receipt of the monthly retainer due [owners],
whichever shall last occur." (Contract at 1.)  The wording of this
provision indicates that the parties merely established a timing for
payment, rather than a condition precedent.  The Contract states
first and foremost that plaintiff is due base compensation of five
thousand dollars per month.  The Contract then separates this
definitive statement with a comma, and proceeds by stating that this
amount shall be payable on the later of one or two dates: the first
of the month or when the defendants receive payment from the Owners.
The Contract does not make payment to plaintiff conditional on
payment from Owners to defendants, but rather merely makes the time
of payment dependent on defendants' payment from Owners.

In *L. Gregg Ivey, Inc. v. Land*, 148 Ga. App. 667, 668 (1979),
the Georgia Court of Appeals held that a similar contract provision

15

created a timing provision and not a condition precedent. *Id.* at 669. In *Gregg*, the appellant had executed two promissory notes for $10,000 to each appellee. The first clause of each of the notes read as follows: "For value received, L. Gregg Ivey, Inc. promises to pay to the order of (apellee) the principal sum of Ten Thousand and No/100 ($10,000.00) Dollars, in legal tender of the United States, to be due and payable in (sic) the date of the closing of the sale of the thirtieth (30th) lot of Whisper Wood Subdivision (i.e., at such time as the 30th of the 32 lots have been sold.)" *Id.* at 667. Appellees filed suits on the notes arguing that a foreclosure sale on the subdivision made the notes due and payable. *Id.* Appellants argued that the notes could never become payable because the foreclosure prevented them from ever selling the 30th lot. The court disagreed with appellants' argument, holding that the reference to the closing of the thirtieth lot in the notes "'was for the purpose of specifying a Time of payment, and not As a condition upon the occurring of which, only, the money was to be repaid." *Id.* at 668. As the court explained, "the promise to repay, though seemingly conditional, imported an absolute liability." *Id.*

Similarly, here the debt incurred by defendants accrued as plaintiff performed work under the Contract. The reference to the first of the month or the time at which defendants received payment from Owners, merely specified a time of payment. Thus, the fact that

16

defendants may not have received payment from the Owners for the full time that work was performed under the Contract term does not extinguish defendants' debt.

This is not to say that a true pay-when-paid provision would not establish a condition precedent. Rather, the Court merely finds that defendants failed to create one. Courts have found pay-when-paid provisions to act as conditions precedent in the contractor/subcontractor setting when the subcontractor's contract contains an explicit and express provision that makes payment by the owner a condition precedent to a subcontractor's right to payment.

In *Sasser & Co. v. Griffin*, 133 Ga. App. 83, 86 (1974), the court held that a provision in a subcontract stating that the contractor shall pay the subcontractor "from the owner only" and that payment will be made within 10 days of receiving money from the owner to be language that clearly expressed the intent of the parties to create a condition precedent. Unlike the present Contract, the contract at issue in *Sasser*, explicitly stated that the money paid subcontractor shall come from the "owner only," and it then indicated the estimated timing of such payment. The Contract in the present case does not make payment of plaintiff's base compensation specifically dependent on payment by Owner. Rather, the monthly base payment is explicitly $5,000, and only the timing is dependent on payment by the Owners.

17

Similarly in *Associated Mech. Corp. v. Eby Constr. Co.*, 67 F. Supp.2d 1375 (M.D. Ga. 1999), the court held that three provisions in the subcontractor's contract created several explicit conditions, rather than mere timing devices. Provision Five of the subcontract provided that the subcontractor shall receive payment after: "all disputes, claims, liens, causes of action and/or lawsuits which are related in any way to this Subcontract or the Subcontractor's performance of the Work are resolved." *Id.* at 1379. Provision 4 of the subcontract provides that payment shall be withheld until "Subcontractor completes, executes, and files with the Contractor a release on the forms supplied by the Contractor." *Id.* Provision 3 of the subcontract provides that "The retained percentage and/or final payment shall be paid to the subcontractor after . . . (3) the Contractor has been paid by the Owner for the Work set forth in this Subcontract." *Id.* at 1378.

The Court found that each of the above provisions created explicit conditions precedent, and did not merely express the time when payment should be made. *Id.* at 1378. The above provisions differ dramatically from the Contract provision at hand, however. For instance, in the former, Provision Five established that final payment was not due until all disputes and/or lawsuits were resolved, thereby establishing a condition which had to be completed prior to performance. In addition, Provision Four explicitly required the

18

subcontractor to complete and execute release forms supplied by the Contractor.   Thus, once again, the Contract clearly established a condition that must occur prior to payment.

At first blush, Provision Three, which requires payment of the contractor by the owner prior to payment of the subcontractor, appears similar to the present provision.   However, the payment provision in *Associated* created an explicit and specific condition of payment to the subcontractor *only* after the contractor receives funds from owner.   This provision does not merely establish when the subcontractor shall be paid, but creates a condition precedent to payment: that contractor receive payment from the owner.   In the present case, the Contract does not establish a condition for receiving payment.   Rather, the Contract states that plaintiff shall receive $5,000 in base compensation, and then merely expresses when that payment shall become due.

The significant difference between the provisions which establish condition precedents versus timing devices in this owner, contractor, subcontractor-type scenario, is that in the cases where the courts have found conditions precedent, the contracts established that the subcontractor shall only receive payment if the contractor receives payment from the Owner.   Here, no such condition has been established.   Rather, the Contract contemplates that plaintiff shall receive $5,000 in base compensation per month without any condition

19

attached.    The Contract then proceeds to protect defendant by providing a timing device in the event that defendant shall receive a late payment from Owner.   The Contract assists the defendant by providing that plaintiff shall receive payment at a later time (*i.e.,* after defendant receives payment from the Owner rather than the first of the month), but it does not excuse defendant from his basic obligation to pay plaintiff $5,000.00 per month.    Had defendant wished to establish such a condition, it could have, and should have, used clear and explicit language, such as that used in the above contracts.

Furthermore, under Georgia law, conditions precedent are not favored in interpreting contracts, and, thus, courts shall construe contracts to avoid their harsh affects. *See Choate Constr., Inc. v. Ideal Elec. Contractors, Inc.,* 246 Ga. App. 626, 628 (2000) ("Conditions precedent, which are not favored in interpreting contracts, are created by language such as 'on condition that,' 'if,' and 'provided,' or by explicit statements that certain events are to be construed as conditions precedent.") (internal citation omitted). If the Contract's terms are not ambiguous and do not "clearly establish a condition precedent," a court cannot interpret the contract so as to create one. *Id.* In the instant case, the Contract language does not contain ambiguity, and fails to establish a

20

condition precedent.  Because the provision in plaintiff's contract does not explicitly make payment conditional on payment by Owners to defendant, the Court cannot read the Contract so as to create a condition precedent.

Further, because no ambiguity exists, the Court can construe the Contract without resorting to rules of statutory construction.  *See Foster v. Ohlwiler*, 266 Ga. App. 371, 375 (2004) (holding if no ambiguity in contract exists, court shall enforce the contract according to its terms irrespective of any rules of construction). For the above reasons, the Court finds the Contract plain on its face, and needs not address any statutory rules of construction.

Even assuming arguendo, that the Base Compensation provision is ambiguous, the Court must construe this provision against the drafter.  *Enterprise Fin. Corp. v. Ross White Enterp., Inc.*, 212 Ga. App. 318, 320 (1994) (court shall construe contract against the drafter).  Here, the evidence indicates that either Ms. or Mr. McGarey, not the plaintiff, drafted the Contract. (McGarey Dep. at 85:2-17 "A: It was not heavily negotiated from Bob's standpoint because I would not have tolerated that. Q: You told him, 'Here are the terms that we would love to have you come on board.  If you're good with that, come on board'?  Is that fair?  A: Essentially.")  To the extent plaintiff had any input in the Contract it was on minor details such as the name of plaintiff's corporation.  (Powell Dep. at

21

49:4-50:14.)    Furthermore, a blacklined version of the Contract reveals that plaintiff did not request any substantive changes to the Base Compensation provision.   ("Blacklined Contract" attach. as Ex. 10 to McGarey Dep.)   Thus, should any ambiguity exist, the Court must construe this provision against McGarey.   Construing the provision against McGarey would result in a finding of no condition precedent.

Because the Court finds that the base payment provision fails to create a condition precedent, plaintiff is entitled to Base Compensation of $5,000 for the months that plaintiff continued to work on the Project. The record, however, does not clearly establish when plaintiff ceased working pursuant to the terms of the Contract.[3] According to Powell, he remained involved on the Project until May or April of 2005.    (Powell Dep. at 104:20-21.)    However, documents indicate that Powell's contribution to the Project may have ceased prior to May or April of 2005.  (September 16, 2004 email, "I will see to completion of my active deals . . .  However, you cannot expect me to expend additional efforts and time generating new prospects for this Project considering the degree of nonpayment.")

Furthermore,  Mr.  McGarey,  himself,  presents  conflicting

---

[3]  The parties continued to work on the Project pursuant to the Contract terms past the stipulated termination of March 31, 2003, thereby effectively extending the length of the Contract. (*See* Mr. McGarey Dep at 128:16-18 indicating that Powell worked past the termination of the Contract: "I think that [Powell] was involved in the deal past the two-year period.")

22

testimony concerning when plaintiff's work under the Contract ceased. On the one hand, Mr. McGarey testifies that the contractual relationship with Powell ended around May 15, 2004, because at this point Powell was no longer involved in the Project. (Mr. McGarey Dep. at 129:14-23.)  On the other hand, Mr. McGarey states that he did not end the relationship with plaintiff in May 2004, that the "the nature of the ending was more a progression" (*Id.* at 130:8-13), and that until the parties reached the "construction goal line" in December, 2004 or January, 2005, he saw Powell as "an active participant in the conclusion." (*Id.* at 131:8-15; 132:5-8.)  Based on this conflicting testimony and the lack of any documentary evidence indicating when Powell ceased work on the Project, a jury must determine when the contractual relationship between the parties ended.  Accordingly, the Court denies summary judgment and finds that a jury must determine exactly what months plaintiff worked on the Project, and award plaintiff Base Compensation pursuant to the terms of the Contract for those months.

### B.  **Plaintiff's Claim for Additional Compensation Under the Contract**

#### 1.  Factual Background

In addition to Base Compensation, plaintiff's Contract with defendants also provided for "Additional Compensation."  Under the Contract, plaintiff would receive Additional Compensation according

23

to the following schedule:

        At 25% lease-up - $25,000.00
        At 50% lease-up - $25,000.00
        At 75% lease-up - $50,000.00
        At 95% lease-up - $50,000.00

(Contract at 2.)

Plaintiff was also entitled to Additional Compensation for any space "leased-up" within sixty days of the termination of the Contract.  (Contract at 2.)  The parties agree that the term "lease-up" in the Contract means those leases fully-executed by the Project Owner and by the tenants.  (DSMF at ¶ 18.)

As noted above, plaintiff's contract was executed on March 16, 2001, and could be renewed for an additional year.  Thus, at the time the plaintiff and defendants entered into this contract, the latter would have expired, at the latest, on March 16, 2003.  Likewise, defendants had a contract with the Owners of the Project that began on March 1, 2001 and that was set to expire on March 1, 2003.

Even though defendants' Leasing Agreement with the Owners and plaintiff's contract with defendants reached this two-year limit, all parties continued to work on the Project past this date.  (DSMF at ¶ 20; Mr. McGarey Dep. at 47:21-48:23.)  As noted, at some time in 2004, the Owners fell into arrears in their payments to the defendants, and the latter agreed to wait until the Owners had closed on a construction loan to receive the payments owed them.

AO 72A
(Rev.8/82)

In late December 2004 or early January 2005, the Owners closed their construction loan, which triggered their duty to pay defendants.   (DSMF at ¶ 25; Mr. McGarey Dep. at 106:25-107:4.) Defendants received payment from the Owners on January 20, 2005 for various fees owed to them by the Owners.   (January 20, 2005 Letter.) As noted *supra*, this amount paid was less than the amount that the defendants felt was due them under their contract with the Owners. On February 10, 2005, defendants paid plaintiff the amount they contended was due him under the Contract for Base and Additional Compensation.   (DSMF at ¶ 35.)   Defendants remitted a check to plaintiff for $50,000 for Additional Compensation and $6,108.21 for the balance due on the monthly retainer.   (DSMF at ¶ 35; "February 10, 2005 Letter" attach. as Ex. D to Mot. for Summ. J.; "Cashed Checks" attach. as Ex. S to Mot. for Summ. J.)

Plaintiff disputes that this $50,000 was the appropriate "Additional Compensation."   Fifty thousand dollars would have been the appropriate additional compensation "at 50% lease-up" ($25,000 at 25% lease-up and $25,000 more at 50% lease-up).   Plaintiff argues, however, that he had arrived at more than 95% lease-up by the end of this contractual relationship with the defendants.   By plaintiff's calculation, then, he would be entitled to $100,000 "Additional Compensation"--$50,000 at 75% lease-up + $50,000 at 95% lease-up--in addition to the $50,000 that has already been paid.

25

Defendants contend that the money they have already paid plaintiff appropriately covers their "Additional Compensation" obligation. Specifically, they argue that the leasing status reports indicated that the Project was not leased up beyond 75% and note that the December 2004 Leasing Status Report indicated that 63.49% of the retail space devoted to the project was subject to executed leases and an additional 8.68% of square footage was out for execution. ("December Leasing Status Report" attach. as Ex. G to Mot. for Summ. J.) Thus, more than 50%, but just less than 75% of the space, was "leased up" at closing, according to defendants.

### 2.   Contract Provision and Potential Ambiguity

As noted, the contract provided for Additional Compensation at four break points: "at 25% lease-up"; "at 50% lease-up"; "at 75% lease-up"; and "at 95% lease-up." The first question that naturally arises, when reading this provision, is the number to which the lease-up phrase refers. That is, 25% of what? Defendants contend that the lease-up goals set out in the contract refer to the amount of retail space that the defendants were given to lease, whatever that number may have turned out to be at the end of the parties' relationship with each other, whenever that happened to occur. Because, by the end of the parties' relationship, apparently 805,683 square feet had been made available to lease, and only 532,046 square feet of the Project was leased up, then defendants contend that only

26

66.04% of the available square footage for the project was leased up. *See* "May 31, 2005 Leasing Status Report" attach. as Ex. Q to Mot. for Summ. J.; DSMF at ¶ 56.   Thus, defendants have contended that plaintiff was entitled to the "additional compensation" payment pegged at the 50% lease-up rate, not the 75% lease-up rate.

Plaintiff contends, however, that the defendants indicated to him at the beginning of their relationship that defendants would be getting 500,000 square feet to lease and that it was both parties' understanding that the leasing goals in the contract referred to a 500,000 square foot figure.   Indeed, the contract between the defendants and the Owners, which had been executed shortly before the defendants and plaintiff entered into their own contractual relationship, called for the defendants to obtain a minimum of 500,000 square feet to lease.  Plaintiff indicates that he would have never agreed to a goal that would be measured against an unpredictable and constantly shifting and increasing amount of rental footage. As just over  500,000 square feet had been leased out, plaintiff insists that he is entitled to the compensation set out for leasing up over 95% of the space.

Unfortunately for plaintiff, the contract nowhere contains the 500,000 square feet figure that he indicates he and the defendants agreed to, although such a reference would have been easy enough to supply.   For instance, the parties simply could have written that

27

Powell would receive $75,000 when 375,000 square feet were leased-up, instead of using a 75% figure. Unfortunately for defendants, the absence of any reference to an amount of footage in the percentage goals that would trigger additional compensation has left defendants open to an argument that the contract is now ambiguous and that, accordingly, the plaintiff should be allowed to provide extrinsic evidence to clarify that ambiguity. Unfortunately, for the Court, the legal briefing by the parties on this point is so sparse that it is difficult for the Court to rule, as a matter of law, on this question. The Court's inability to rule at this juncture means that it must deny the defendants' motion for summary judgment as to the amount of Additional Compensation due the plaintiff.

The defendants argue that the Court should not consider plaintiff's evidence about oral conversations between the parties to the effect that the parties were agreeing to a 500,000 square foot base figure, because to do so would allow oral testimony to vary the terms of a written contract. Even assuming that the Court agreed with that argument, the Court would still be faced with the task of deciding what the parties' agreement was as to the amount of leased-up square footage against which the various percentage goals was being measured. It is a basic mathematical truth that to calculate the product of two numbers, one has to first have two numbers to multiply against each other. Here, the contract spells out only the

28

multiplier—the percentage figure—but does not specify the multiplicand—the square footage against which this percentage figure should be multiplied.   Either the court, applying the rules of statutory construction, or a jury, must figure out what the parties' understanding was as to the multiplicand here.

As plaintiff further points out in objecting to a grant of summary judgment for the defendants, defendants' position does not reflect the motivations that typically govern business relationships nor does it appear supported by common sense.   That is, defendants' position is that even if the plaintiff had leased out 100% of the footage available to be leased during the course of his relationship with the defendants—and would therefore seemingly be entitled to the highest level of compensation for that work—had the Owners allotted, on the last day of the contract period, another 500,000 feet of space to be leased, the plaintiff would then have found his percentage of leased space reduced accordingly and his incentive payment thereby cut in half, even though the plaintiff would have still leased out the same amount of space.   Such a method seems an odd way to measure the plaintiff's contribution to defendants' efforts.

Further, one would expect the defendants to implement an incentive system for the plaintiff that would mesh with the method by which the defendants were being compensated.   Thus, if the Owners had contracted with the defendants to pay the latter based only on the

29

percentage of space leased at the end of the contractual period, even if the space available could increase greatly throughout that period, then it would be understandable that the defendants would impose the same formula on the plaintiff.  Yet, the defendants' additional compensation system was based totally on the amount of space leased, at the rate of $3.00 per square foot leased; the percentage of available space that had actually been leased did not factor into the calculation of their additional compensation.

In short, for the above reasons, the Court **DENIES** defendants' motion for summary judgment as to the plaintiff's claim for additional compensation.

### C.   Plaintiff's Implied Contract Claims

Plaintiff also seeks recovery under the equitable doctrines of unjust enrichment and quantum meruit.  Plaintiff bases these claims on the fact that plaintiff continued to work for defendants under the terms of the Contract and expected payment pursuant to the terms of the Contract, even though the Contract was set to expire in 2003. (Opp'n to Mot. for Summ. J. at 16.)  However, defendants concede for purposes of the motion for summary judgment that the Contract is valid and binding during the time period in question.   (Mot. for Summ. J. at 15.)  Plaintiff may not bring a claim for quantum meruit where an express contract exists. *Harden v. TRW, Inc.*, 959 F.2d 201, 204 (11th Cir. 1992) (express contract precludes a quantum meruit

30

recovery.)

Furthermore, to the extent that defendants argue the invalidity of the Contract beyond March 31, 2003, for purposes beyond this motion, the uncontroverted evidence demonstrates that the parties acted pursuant to the written terms of the Contract after the Contract's expiration date, thereby ratifying the Contract. (DSMF at ¶ 20.) Parties may impliedly consent that the contract not terminate at the stipulated end date, and that the contract be renewed according to the same terms. *See Empire Box, Inc. v. Moore*, 87 Ga. App. 57, 66-67 (1952) (parties tacitly renewed contract for employment when plaintiff continued performing the same obligations as required under the first yearly contract and defendant accepted services until he was wrongfully discharged.) Thus, the terms of the express contract shall govern this action.

The Court finds, as a matter of law, that the conditions of the express contract govern, and that plaintiff may not seek recovery under a claim of quantum meruit. Even though a plaintiff may submit alternative theories of recovery where there exists sufficient evidence to support both, where the evidence is "overwhelming," a court may find an express contract, as a matter of law, thereby precluding a recovery under quantum meruit. *Harden,* 959 F.2d 201, 204 (11th Cir. 1992). *See also Williams v. City of Atlanta*, 281 Ga. 478, 640 S.E. 2d 35, 37 ( 2007) (where an express contract covers the

AO 72A
(Rev.8/82)

compensation claimed under a quantum meruit claim, the contract governs) (internal citation omitted); *Haldi v. Watson*, 240 Ga. App. 801, 802 (1999) (implied and express contract regarding the same subject matter cannot exist.) (internal citation omitted).

### D.   **Plaintiff's Fraud Claims**

Plaintiff also alleges that McGarey made three potentially fraudulent misrepresentations.  First, plaintiff's Second Amended Complaint alleges that McGarey either intentionally misrepresented or concealed the identity of the Owner of the Project.   Second, plaintiff claims that McGarey either intentionally misrepresented or concealed the fact that its agreement with the owner expired in 2003. Finally, plaintiff alleges that defendant misrepresented the amount of compensation it received from the Owner when the construction loan closed.   (Sec. Am. Compl. at ¶¶ 55-58.)

Under Georgia law, a plaintiff must prove the following five essential elements to successfully allege a claim for fraud or fraudulent misrepresentation:  (1) a false representation by defendant; (2) scienter; (3) an intent to induce the actor from acting or refraining from acting; (4) reasonable reliance; and (5) damage as a result of the reliance. *Bacote v. Wyckoff*, 251 Ga. 862, 865 (1984); *Am. Casual Dining, L.P. v. Moe's Southwest Grill, LLC*, 426 F. Supp. 2d. 1356, 1364 (N.D. Ga. 2006) (Thrash, J.).

As to plaintiff's first allegation of fraudulent

32

misrepresentation regarding the correct identity of the Owner on the Project, the Court finds that plaintiff cannot demonstrate reliance or damage.  In his deposition, Powell admitted that the identity of the Owner did not matter to him.  ("Q: And it wasn't important to you that it was the entity JDI that paid Mcgarey in order to pay you, was it?  A: No, so long as they were the owners of the project that I was working on." Powell Dep. at 195:19-23.)  Thus, plaintiff could not have relied on any alleged misrepresentation regarding the identity of the Owners.

Moreover, Powell does not assert that he suffered any damage as a result of any alleged misrepresentation regarding the identity of the Owners.  In particular, plaintiff did not assert that the alleged difference in names of corporate owners caused defendant not to pay plaintiff his full compensation under the contract.  Plaintiff points to no evidence in the record and altogether fails to argue that the correct identity of the corporate Owner damaged him.  *See Novatel Commc'ns, Inc. v. Cellular Tel. Supply, Inc.*, Civ. A. No. A-C85-2674A, 1986 WL 798475, * 22 (N.D. Ga. Dec. 23, 1986) (though plaintiff alleges in its pleadings that defendants' misrepresentation caused it damages, plaintiff fails to offer any support for its contention in its opposition to defendants' motion for summary judgment, and a mere allegation of injury in the pleadings is not sufficient to oppose a motion for summary judgment).  Accordingly,

33

plaintiff has failed to raise any argument that plaintiff relied on, or suffered damage, because of defendants' alleged misrepresentation regarding the corporate ownership.

Similarly, plaintiff fails to raise any argument that he relied on, or suffered damage, as a result of defendants' second alleged misrepresentation concerning the expiration of defendants' contract with the Owner.  Plaintiff admits that because of the late payments from defendants, he sought additional work outside the Project, and, thus, cannot claim that he decided to forego another opportunity because of the alleged end of the Leasing Agreement.  (DSMF at ¶ 71; Powell Dep. at 35:3-38:8.)

For instance, plaintiff worked with Anthony Filingeri, an owner of Sprint Stores in August, 2004, to locate possible store locations for him in Florida.   (DSMF at ¶ 72; Powell Dep. at 35:3-38:8.) Additionally, in an email sent to defendant on September 16, 2004, plaintiff stated that given the degree of late payment by the Owners, defendants could not expect him to exert the same level of effort on the Project, and that plaintiff had to "put food on the table," and that he would be searching for other opportunities.  (DSMF at ¶ 73; "September 16, 2004 email" attach. as Ex. H to Mot. for Summ. J.) Finally, in his deposition, when asked what he would have done differently had he known that McGarey was going to be replaced on the Project, he stated, "Probably nothing."  (DSMF at ¶ 74; Powell Dep.

AO 72A
(Rev.8/82)

at 159:2-6.)

Based on the above, plaintiff cannot contend that he relied on any representation by defendants regarding the existence of a Leasing Agreement with the Owners. Specifically, plaintiff does not contend that he would have acted differently had he known that defendants' Leasing Agreement with the Owners expired. Accordingly, the Court finds that plaintiff cannot demonstrate that defendants fraudulently misled him with respect to the alleged end of the contract with the Owners. *See Novatel Commc'ns, Inc. v. Cellular Tel. Supply, Inc.*, Civ. A. No. A-C85-2674A, 1986 WL 798475, * 22 (N.D. Ga. Dec. 23, 1986) (summary judgment appropriate where plaintiff failed to show that it did anything in reliance or to its detriment in reliance on alleged misrepresentations.)

Finally, plaintiff contends that defendants intentionally misrepresented that they received their monthly base pay only through the first week of July, when defendants, in fact, received base pay from the Owners through October 2004. (Second Am. Compl. at ¶¶ 27, 58.) In essence, plaintiff contends that McGarey's February 10, 2005 Letter to plaintiff contained a misrepresentation that defendants had only received base compensation through one week of July 2004.

Assuming that defendants' statement in their February 10, 2005 Letter that they only received base compensation through the beginning of July, 2004 constitutes a misrepresentation, the Court

35

finds that plaintiff failed to allege any reliance on defendants'
statement.    Shortly after defendants sent this letter, plaintiff
filed suit alleging that defendants owed him additional compensation
under the Contract.    In fact, when plaintiff received the February
10, 2005 Letter, he believed that defendant misinterpreted the
Contract and he contacted his lawyer.  (Powell Dep. at 171:16-23 "Q:
So you believed when you read Ms. McGarey's [February 10, 2005]
letter and when you faxed it to [your lawyer], you believed Ms.
McGarey's interpretation of your contract was wrong? A: Correct.  Q:
And so you what with the information? A: I sent this to my attorney.
I was asking my attorney what he thought I should be doing at this
point.")  Plaintiff's actions indicate that at no time did he rely on
defendants' alleged representation that the Owners paid defendants
only through July.  Accordingly, plaintiff fails to establish that he
either relied on, or was damaged by, defendants' misrepresentation.

**E.   Plaintiff's Deceit/Misrepresentation of Fact/Concealment
of Fact Claims**

Powell asserts a deceit/misrepresentation of fact/concealment of
fact claim based on the same alleged misrepresentations that form the
basis of his fraud claim.  The elements of fraud and deceit are the
same.  *See Parsells v. Orkin Exterminating Co., Inc.*, 172 Ga. App. 74
(1984).  Thus, plaintiff's deceit claims fail for the same reason
that plaintiff's fraud claim fails.

36

Likewise, plaintiff's fraud claim constitutes a claim for fraudulent misrepresentation. Thus, plaintiff's specific fraudulent misrepresentation/omission claim fails for the same reason that his fraud claim fails.

In addition, the Court cannot construe defendants' misrepresentation claim as one for negligent misrepresentation (thereby relieving plaintiff of the duty to demonstrate knowledge on the part of the defendants), because the section of plaintiff's Second Amended Complaint dealing with his misrepresentation/deceit claim states that defendants made "willful and intentional misrepresentations to Plaintiff and intentional omissions of fact." (Second Am. Compl. at ¶ 58). Based on the above language, plaintiff cannot contend that defendants made a mere negligent misrepresentation.

## F.    Plaintiff's Claim for Attorney's fees

Plaintiff contends that defendants' willful and intentional refusal to pay monies due under the contract with defendants, which forced plaintiff to seek counsel where no bona fide controversy exists, constitutes bad faith, stubborn litigiousness, and, therefore, necessitates attorney's fees under O.C.G.A. § 13-6-11. O.C.G.A. § 13-6-11 provides:

> The expenses of litigation generally shall not be
> allowed as a part of the damages; but where the
> plaintiff has specially pleaded and has made prayer

37

> therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

O.C.G.A. § 13-6-11.

To recover attorney's fees under the above statute, plaintiff must demonstrate that one of the three conditions set forth in the statute exists. *See Beacon Indus., Inc. v. Vanderbunt Concrete, Ltd.*, 172 Ga. App. 573, 575 (1984) (internal citation omitted). Bad faith requires more than bad judgment or negligence. Rather, it imports a "dishonest purpose" or "some moral obliquity" and implies "conscious doing of wrong" and a "breach of known duty through some motive of interest of ill will." *TSG Water Res., Inc. v. D'Alba & Donovan Certified Public Accountants*, 366 F. Supp. 2d 1212, 1231 (Ga. 2004). Plaintiff must show that defendants refused to fulfill their professional duties " 'out of some interested or sinister motive, or that [they] consciously acted for some dishonest or improper purpose.' " *Id.* (internal quotation omitted). However, the mere failure of defendants to pay a claim does not rise to the level of bad faith. *Id.* (internal citation omitted). Additionally, a refusal to pay a disputed claim does not constitute stubborn litigiousness, nor will it support a claim that defendants caused the plaintiff unnecessary trouble and expense. *Id.* (internal citations omitted).

38

In the present case, there is no evidence that defendants acted out of bad faith.   Where plaintiff fails to establish bad faith, plaintiff cannot establish that defendants have caused unnecessary trouble and expense if a bona fide controversy exists between the parties.   *Backus Cadillac-Pontiac Inc. v. Brown*, 185 Ga. App. 746, 747 (1988) (internal citation omitted).   If the evidence demonstrates that a genuine dispute exists, in law or fact, then the plaintiff cannot recover attorney's fees under O.C.G.A. § 13-6-11.   *Id*.   Here, the record indicates that a bona fide controversy exists. Accordingly, plaintiff's claim fails as a matter of law.

Plaintiff argues that where there is sufficient evidence to send a fraud claim to the jury, the court must send an accompanying claim for attorney's fees under O.C.G.A. § 13-6-11 to the jury.   Other courts in Georgia have similarly held that intentional torts, such as fraud, invoke a species of bad faith, and, thus, an individual harmed in such a manner may recover attorney's fees.   *St. Paul Fire & Marine Ins. Co., v. Clark*, 255 Ga. App. 14, 24 (2002) (because jury received authorization to find fraud, it could also find bad faith).   However, in the present case, as the Court has found no basis to send plaintiff's fraud claim to the jury, it must deny plaintiff's claim for attorney's fees on this particular ground.

AO 72A
(Rev.8/82)

## G.   Plaintiff's Claim to Pierce the Corporate Veil

Plaintiff contends that the individual defendants, Mr. and Ms. McGarey, shall be held personally liable for all awarded damages. Specifically, plaintiff argues that Mr. and Ms. McGarey used their corporate alter ego to perpetuate the intentional torts of fraud, deceit, and misrepresentation of and/or concealment of fact upon plaintiff.  (Second Am. Compl. at ¶ 62.)

Under Georgia law, a party may pierce the corporate veil "to remedy injustices which arise where a party 'has over extended his privilege in the use of a corporate entity in order to defeat justice, perpetuate a fraud or to evade contractual or tort responsibility.'" *Cooper v. Re/Max North Atlanta, Inc.*, 186 Ga. App. 79, 82 (1988) (internal quotation omitted). This theory applies when the individuals and corporation have "'such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist.'" *See Multi-Media Holdings, Inc. v. Piedmont Ctr., 15 LLC*, 262 Ga. App. 283, 285 (2003) (internal quotation omitted).

The Court must then determine whether the individual defendants and sole owners/shareholders of McGarey used the corporation's assets and authority interchangeably. *Id.* Specifically, a court may pierce the corporate veil if plaintiff can prove one of the following: (1) the shareholders disregarded the corporate entity, thereby making the

40

entity a mere instrumentality for the transaction of their own affairs; (2) that there is such a unity of interest and ownership that there are no longer separate personalities of the corporation and the individuals; or (3) adherence to the doctrine of a corporate entity would promote injustice or perpetuate fraud. *See Dearth v. Collins*, 441 F.3d 931, 934 (11th Cir. 2006) (internal citations omitted).

Here, there is no evidence that the individual defendants disregarded the corporate entity and made it an instrument for their own affairs, or that the interests of the individuals and McGarey have become so "unified" that the "separate personalities" no long exist. Rather, the evidence indicates that the individual defendants maintained a separate corporate structure. McGarey is properly incorporated (DSMF at ¶ 79), files its own tax returns (DSMF at ¶ 78), and holds insurance for itself. (DSMF at ¶ 80.) Additionally, an outside firm handles McGarey's payroll (DSMF at ¶ 81), McGarey employees individuals in different locations who are paid benefits and salary by McGarey (DSMF at ¶ 82), and McGarey has a separate business address from the home residence of Chris and Denver McGarey. (DSMF at ¶ 83.)

Plaintiff argues that the Court may pierce the corporate veil based on defendants' alleged misrepresentations. *See Dearth v. Collins*, 441 F.3d 931, 934 (11th Cir. 2006). Because the Court finds

41

that the McGareys did not make any fraudulent misrepresentations, there is no basis for piercing the corporate veil, and defendants' Motion for Summary Judgment is granted as to this matter.

## III. **Defendants' Motion to File an Affirmative Defense**

Defendants also seek to file an amended answer, asserting the affirmative defense of accord and satisfaction. ("Mot. to File Am. Answer" [46].)  At this stage of the litigation, defendants may amend their answer only by leave of court under Federal Rule of Civil Procedure 15(a).  FED. R. CIV. P. 15(a) directs that "[l]eave [to amend] shall be freely given when justice so requires."   "In determining whether to grant leave to amend, a court may consider undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of the amendment."  *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1110 (11th Cir. 1996) (internal citation omitted).  Furthermore, district courts have limited discretion to deny a party leave to amend pleadings.  *See id.*

Here, there is no evidence that granting defendants leave to amend their answer will prejudice plaintiff.  First, plaintiff now possesses the checks and other documentary evidence supporting defendants' claims.  Second, there is no evidence that defendants engaged in bad faith.  Defendants represent that they moved to amend their answer at the first opportunity after the two cancelled checks

42

(forming a basis of defendants' accord and satisfaction defense) were discovered.   (Mot. to File Am. Answer at 5.)   Plaintiff does not contest this fact.   In fact plaintiff received the two checks from defendant prior to defendants' deposition taking.   (Opp'n to Mot. to File Am. Answer [48] at 3.)   The Court, therefore, sees no prejudice in allowing defendants to amend their answer to include an accord and satisfaction defense.

As the Eleventh Circuit has noted, the "the purpose of requiring affirmative defenses to be pled in the answer is to facilitate trial preparation." *Easterwood v. CSX Transp., Inc.*, 933 F.2d 1548, 1551 (11th Cir. 1991) (internal citation omitted).   Granting leave to defendants to amend their answer to add an accord and satisfaction defense will not hinder plaintiff's preparation for trial. Furthermore, to the extent plaintiff feels that adding the affirmative defense of accord and satisfaction requires additional discovery, plaintiff may file a motion with this Court to re-open discovery on this limited issue.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** defendants' Motion for Summary Judgment [49]; **GRANTS** defendants' Motion to File an Amended Answer [45, 46]; and **DENIES** plaintiff's Motion to File and Substitute Original Depositions in Place of Filed Certified Copies [59] and, as requested by plaintiff,

43

in the alternative, the Court will accept the certified copies previously filed.

SO ORDERED, this 28 day of March, 2007.


JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

44